**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JEREMIAH CAIN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. |
| **ANTHONY WOJCIK, REYNALDO** ) | |
| **GUEVARA, GERI LYNN YANOW, as** ) | |
| **SPECIAL REPRESENTATIVE FOR** ) | |
| **ERNEST HALVORSEN, DANIEL ENGEL** ) | |
| **JEROME BOGUCKI, RAY SCHALK,** ) | |
| **NANCY NAZARIAN, the CITY OF CHICAGO,** ) | |
| **and COOK COUNTY,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

## COMPLAINT

Plaintiff, JEREMIAH CAIN, by his undersigned attorney, BONJEAN LAW GROUP,

PLLC, brings his complaint against former Police Detectives, ANTHONY WOJCIK,

REYNALDO GUEVARA, GERI LYNN YANOW AS SPECIAL REPRESENTATIVE FOR

ERNEST HALVORSEN, deceased, DANIEL ENGEL, JEROME BOGUCKI, RAY SCHALK,

the CITY OF CHICAGO, and COOK COUNTY.

## INTRODUCTION

1.      Plaintiff, Jeremiah Cain, spent 23 years incarcerated in the Illinois Department of

Corrections for the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo – crimes he

did not commit.

2.      In and around March 22, 1999, the Police Officer Defendants conspired among

themselves and with others, known and unknown, to frame Plaintiff for the murder of Garcia.

3.      Plaintiff's arrest, indictment, prosecution, and conviction were based entirely on fabricated evidence and a false and fabricated statement physically and psychologically coerced from Plaintiff by Defendant Wojcik.

4.      Defendant Nazarian, acting in an investigatory capacity, knew Plaintiff's confession was false and coerced by Defendant Wojcik, assisted in "improving" the false and fabricated confession, and falsely reassured Plaintiff that he would only be charged with a gun case.

5.      All of the Defendants concealed the fact that they conspired to and did frame Plaintiff and his criminal co-defendant Eruby Abrego for Garcia's murder. Notorious Chicago police detectives operating out of Area Five targeted Plaintiff and Abrego for the murder solely because the Plaintiff and Abrego were members of the Orchestra Albany street gang.

6.      In addition to physically coercing false and fabricated statements from Plaintiff and Abrego, the Defendant Officers manipulated a false identification of Abrego from witnesses to the shooting, witnesses who later confessed that Defendants Guevara and Halvorsen told them who to identify from the identification procedure.

7.      At no point did the Defendants disclose to the criminal justice system that they fabricated inculpatory statements from Plaintiff and his criminal co-defendants, physically abused and made false promises to Plaintiff, and manipulated false identifications of Abrego.

8.      The Defendant Officers further concealed *Brady* material that would have demonstrated Plaintiff's innocence at trial. Defendants knew that Plaintiff had not provided a gun to Abrego to carry out the shooting and did not hide the murder weapon for Abrego.

9.      Plaintiff is one of over 40 men and women who have been exonerated after being convicted of murder charges arising from corrupt homicide investigations conducted by Area Five detectives, including Defendants Wojcik, Guevara and Halvorsen.

10.      Indeed, the Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

11.      Both Defendants Guevara and Halvorsen have repeatedly invoked their Fifth Amendment rights not to incriminate themselves in response to questions about whether they framed scores of Latino men and women from Humboldt Park, including whether they engaged in investigatory misconduct in this case.

12.      For his part, in 2016, Defendant Wojcik was investigated by the Office of Inspector General ("OIG") for his role in the Laquan McDonald shooting coverup. The OIG concluded that Wojcik had made false police reports and destroyed police reports in connection with the McDonald shooting investigation. The OIG recommended that Defendant Wojcik be terminated for his role in the McDonald shooting cover-up; Wojcik retired instead of facing discipline.

13.      After the commencement of a post-conviction evidentiary hearing in the Circuit Court of Cook County where eight witnesses testified under oath about Defendant Wojcik's misconduct, including his use of physical abuse during interrogations of suspects, the Cook County State's Attorney agreed that Plaintiff's conviction should be vacated on actual innocence grounds.

14.      On August 9, 2022, Cook County State's Attorney Kim Foxx publicly declared that she could not stand by the conviction of Plaintiff and eight other individuals. The State

appeared before the Honorable Judge Carol Howard on that day and dismissed the charges against Plaintiff.

15.     Plaintiff served 23 years in the department of corrections for crimes that he did not commit.

16.     Plaintiff now seeks justice for the inconceivable harm that the Defendants caused him and redress for the incalculable loss of liberty and hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution as well as the deprivation of rights under Illinois state law.

18.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367. Venue is proper under 28 U.S.C. §1391(b), because the parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

## PARTIES

19.     Plaintiff Jeremiah Cain is a 48-year-old who spent 23 years in prison for a crime he did not commit.

20.     At all relevant times hereto, Defendants Anthony Wojcik (Star No. 20834), Reynaldo Guevara (Star No. 20861), Ernest Halvorsen (Star No. 20692), Ray Schalk (Star No. 20718), Jerome Bogucki (Star No. 20668), and Daniel Engel (Star No. 21114) were members of the Chicago Police Department. Each of these defendants conspired with one another and with other persons, known and unknown, to conceal and fabricate evidence, manipulate witness

testimony, coerce fabricated statements, and maliciously prosecute Plaintiff for the murder of Jose Garcia.

21.     Geri Lynn Yanow, as Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

22.      Defendant City of Chicago is an Illinois Municipal Corporation, which employs or employed the Police Officer Defendants at the time of the events giving rise to this suit.

23.     At all relevant times, Defendant Nancy Nazarian, was an Assistant Cook County State's Attorney. She conspired with the Police Officer Defendants to frame Plaintiff while serving in an investigatory capacity.

24.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of Defendant Nazarian. Defendant Cook County is a necessary party to this lawsuit.

25.     Each and every Defendant is sued in his/her individual capacity, and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this Complaint.

## FACTUAL ALLEGATIONS

**A.      The Shooting at Belmont and Monticello**

26.     On March 22, 1999, at approximately 5:30 p.m., 20-year-old Julio Lugo was a passenger in his cousin Fred Marrero's car along with his younger cousin Ysidro Quinones; the group was headed to the store to pick up groceries for Lugo's aunt.

27.     On the way to the store, Lugo observed a gold Chevy Caprice with four or five

5

people in it throwing gang signs at them; one guy threw a bottle at their car. Lugo and his cousins drove away and continued to the store at Belmont and Monticello.

28.     After arriving at Belmont and Monticello, Lugo jumped out of the car and recognized two friends, Ramon Torres and Jose Garcia driving eastbound on Belmont. Torres and Garcia stopped and Lugo and his little cousin Ysidro stopped to talk to Torres and Garcia.

29.     As Lugo was standing at the driver's side of the car, Lugo observed someone standing about 10 to 15 feet away on Monticello. Lugo couldn't really see the person as he was across the street. The individual flashed gang signs and shouted "OA" gang slogans before throwing on his hoody and retrieving a gun from his pouch and shooting at Torres' car.

30.     Lugo shielded his younger cousin and was shot twice while Garcia who was seated in the passenger seat of Torres' car was shot in the head and died at the scene.

31.     Lugo admitted that he did not see the gold Chevy Caprice at the scene of the shooting on Belmont and Monticello. Lugo described the shooter to Defendants Guevara and Halvorsen as 5'8" – 5'10", male with a dark complexion. Lugo was never able to make an identification of the shooter despite viewing multiple line-ups.

**B.     Defendants Fabricate a False Statement from Juan Parra**

32.     Defendant Bogucki was assigned to assist in the homicide investigation of Garcia. Defendants Schalk, Wojcik, Engel, Guevara and Halvorsen were also working the case.

33.     Defendants began searching for the owner of a Chevy Caprice and seized on 19-year-old Juan Parra who was a member of the OA street gang. Defendants prepared a photo array that included a photo of Parra and displayed it to Torres and Lugo. Neither of them identified Parra.

34.     Even though there was no evidence whatsoever to believe that Parra had anything

to do with the shooting, Defendants arrested Parra and brought him to Area Five on March 23, 1999 at roughly 1:30 a.m.

35.     Defendants interrogated Parra, held him overnight, and falsely told him that they had developed evidence that implicated him as the perpetrator of the crime. Defendants promised Parra that if he adopted a false narrative fed to him, he would only be a witness and would not be charged with the crime. Parra repeatedly told the Defendants he had no role in the murder, but Defendants Schalk, Bogucki, Wojcik, and Engel continued to interrogate him, eventually overcoming his will and forcing him to repeat the false confession.

36.     According to the Defendants, Parra gave a statement that he, "Sef" (Eruby Abrego) "PeeWee" (Nicasio Santiago) and "Cain" (Jeremiah Cain) drove into Latin King territory and initiated a confrontation with Latin Kings. PeeWee and Cain then returned to Parra's car, but Sef did not. Parra pulled into an alley and waited. He heard several shots and saw Sef running back to the car holding a gun.

37.     Defendants concealed evidence that they fabricated Parra's false statement and fed it to him, forcing him to repeat it knowing it wasn't true. Defendants further concealed that they obtained Parra's false statement through coercion, threats, and false promises.

**C.     Defendants Fabricate a False Statement from Plaintiff Through the Use of Physical Violence, Threats, and False Promises.**

38.     Having obtained Parra's false and fabricated statement, Defendants Schalk, Bogucki, and Wojcik arrested Plaintiff at his home located at 3935 W. Diversey at roughly 5:00 a.m. on March 24, 1999.

39.      Outside the presence of the Plaintiff, Defendant Wojcik and Engel recovered a .357 magnum from Cain's bedroom that was allegedly the gun used in the shooting at Belmont

and Monticello.

40.     Two days before Plaintiff's arrest, a young member of the OA street gang came to his apartment and told Plaintiff that "PeeWee" (Nicasio Santiago) a fellow gang member wanted him to hold onto his gun. Santiago had bought the gun with the assistance of a guy in the neighborhood in exchange for narcotics. Cain, who was a member of the OA street gang, agreed to hold on to the gun. Plaintiff had no knowledge that the gun was involved in any crime.

41.     Defendant Wojcik interrogated Plaintiff at Area Five for approximately 13 hours. Defendant Wojcik told Plaintiff they already knew Plaintiff was involved in Garcia's murder because Parra had told them everything.

42.     Plaintiff repeatedly denied his involvement in the shooting and denied having any knowledge about the shooting. Over the course of 13 hours, Defendant Wojcik became increasingly agitated with Plaintiff, raising his voice, using profanities, and eventually telling Plaintiff that if he did not regurgitate Parra's version of events (that was fabricated by the Defendants) he would be charged as the shooter.

43.     When Plaintiff refused to adopt the false story, Defendant Wojcik began to physically assault Plaintiff first slapping him in the face as hard as he could. Defendant Wojcik punched Plaintiff in the stomach and the chest with such force that Plaintiff thought he would vomit.

44.     Defendant Wojcik left out of the interrogation room after beating Plaintiff. When Defendant Wojcik returned, he changed strategies and told Plaintiff that if repeated the false narrative fabricated by the Defendants, Plaintiff would only be charged with a gun case.

45.     Plaintiff eventually agreed to "cooperate" out of fear that he would continue to be beaten by Defendant Wojcik and out of fear that he would be charged with a murder he did not

commit. Plaintiff did not know that Defendants intended to falsely charge Plaintiff with the murder either way.

46.     Plaintiff rehearsed the false story with Defendant Wojcik and in the presence of Defendant Nazarian who was present when Defendant Wojcik coached Plaintiff on exactly what to say before a court reporter.

47.     After Plaintiff made a court reported story repeating the false story, Defendant Wojcik added and embellished the false story in the presence of Defendant Nazarian. Defendant Nazarian and Wojcik together strengthened Plaintiff's false statement to make Plaintiff guilty of murder under an accountability theory, knowing the statements were not true.

48.     Defendant Nazarian was present when Defendant Wojcik reassured Plaintiff that he was only being charged with a gun case and would be used as witness. Defendant Nazarian did not tell Plaintiff that he was actually being charged with murder.

49.     Defendants concealed evidence that they physically coerced Plaintiff's confession and promised him that if he adopted the false story, he would only be charged with a gun case.

**D.     Defendants Arrest Abrego and Santiago**

50.     Defendants arrested Eruby Abrego and Nicasio Santiago on March 24, 1999.

51.     Defendants interrogated Abrego for 48 hours. He was physically abused by Defendant Wojcik, threatened, denied access to the bathroom, and denied the opportunity to speak to an attorney.

52.     Defendant Wojcik repeatedly struck Abrego in various parts of his body. Abrego urinated on himself and began vomiting blood. Defendant Wojcik showed Abrego the false and fabricated statements of Parra and Cain, telling him that they already had the evidence to convict him and if he just repeated the false statement, the beating would end. Abrego's will was

eventually overborne and he provided the false and fabricated story that was fed to him by the Defendants.

**E.     Defendants Manufacture False Identification Evidence**

53.     Defendants also obtained false identifications of Abrego using suggestive identification procedures.

54.     Witnesses described the shooter as "black Hispanic" and between 5'7" and 6' in height. Abrego is light-skinned and very short, around 5'4"

55.     Defendants knew that Abrego was not the shooter and that Defendant Cain had not provided Abrego with any murder weapon.

56.     Defendants Guevara and Halvorsen instructed victim Julio Lugo and witnesses Ramon Torres and Isidro Quinone to falsely identify Plaintiff as the shooter.

57.     Defendants Guevara and Halvorsen told the witnesses that Abrego was the shooter and that he was the person who killed their loved ones. Torres knew that the person he saw shooting the weapon was not Abrego but he identified him anyway, because Defendant Guevara told him to.

58.     Lugo had failed to identify Abrego as the shooter because he did not see the shooter but eventually went along with Defendants Guevara and Halvorsen's instruction to identify Abrego.

59.     The Defendants authored police reports that reflected the fabricated evidence, including the false identifications of Abrego.

**F.     Plaintiff's Wrongful Conviction**

60.     As a result of the Defendants' misconduct, Plaintiff was wrongly convicted of the murder of Jose Garcia and aggravated battery of Julio Lugo under a theory of accountability.

61.     Based on the misconduct of the Defendants, the trial prosecutors advanced a false theory at trial that Plaintiff provided the murder weapon to Abrego and then hid the murder weapon after the crime.

62.     The State's case hinged on the false, fabricated and physically coerced statement of Plaintiff.

63.     Plaintiff was convicted after a bench trial and was sentenced to 25 years' imprisonment.

64.     Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff was denied the opportunity to have meaningful relationships, start a family, and have children. He was deprived of the basic pleasures of human experience which all free people enjoy as a matter of right.

65.     Plaintiff lived with the terror of not knowing whether the truth would ever come out and ultimately served nearly all of his prison sentence before the truth of his innocence was revealed.

66.     In addition to the trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, and other physical and psychological effects.

**G.     Plaintiff's Exoneration**

67.     Plaintiff always maintained his innocence while incarcerated.

68.     During post-conviction proceedings, compelling evidence was presented that the true perpetrator of this crime was Nicasio Santiago who carried out the shooting with an

uncharged co-offender. Santiago admitted under oath that he used his own gun to carry out the shooting and that he did not get the gun from Plaintiff. Santiago admitted that Cain had no knowledge or involvement in the shooting.

69. The identification witnesses admitted that Defendants Guevara and Halvorsen manipulated their testimony and that they falsely identified Abrego as the shooter.

70. On July 20, 2022, the Circuit Court of Cook County vacated Plaintiff's convictions and the State dismissed all charged against Plaintiff.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

71. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice on scores of criminal defendants like the one endured by the Plaintiff.

72. Since the 1980s, no fewer than 100 cases have to come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

73. These cases include many in which Chicago police officers used the same tactics that Defendants employ against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing statements through physical and psychological abuse, and manipulating witnesses in order to influence eyewitness identifications and testimony - all to secure the arrest, prosecutions, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

74. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

75.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

76.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

77.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

78.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

79.     In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

80. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

81. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

82. Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

83. For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of disgraced (and imprisoned) officer Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in the 1980s as gang crimes officers before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzianowski to pin murders on innocent men.

84. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago

police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

85.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

86.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

87.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused

of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

88.     This belief extends to the Defendants in this case. By way of example, Defendants Halvorsen, Guevara, Wojcik, Engel and Bogucki, have a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which these Area Five Defendants and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

89.     The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

    a.    The conducting of live lineup, photographic, and other identification procedures.

    b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    c.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

    d.    The use of anonymous or confidential informants.

    e.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

f.      The risks of engaging in tunnel vision during investigation.

g.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

90.      The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

91.      Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

92.      The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

93.      The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

94.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Wojcik's Long History of Framing Innocent People**

95.     Defendant Wojcik has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Wojcik engaged in serious investigative misconduct.

96.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Wojcik and others, it is apparent that Wojcik engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

97. A few examples of Defendant Wojcik's misconduct include:

a.      On June 30, 1988, the FBI registered a complaint against Defendant Wojcik with the Chicago Police Department's Office of Professional Standards ("OPS"). The FBI complaint reported that Defendant Wojcik and another officer were under investigation for alleged extortion of a weapon from a F.B.I. informant. The FBI report detailed how Defendant Wojcik arranged, under FBI surveillance, for an illegal transfer of a rifle with a telescopic sight to Defendant Wojcik. An OPS investigation found that Defendant Wojcik had failed to properly inventory recovered property and had made a "false report" about this incident.

b.      On March 21, 1988, Defendant Wojcik engaged in misconduct when he forced his way into a suspect's home, verbally abused the person, and also slapped the suspect several times in the head and kicked him in the body.

c.    In response to a lawsuit filed against the city, OPS investigated eight officers, including Defendant Wojcik, for their involvement in a wrongful conviction. The so-called "offender" alleged that, in October 1988, he was forced to sign a false confession following threats by Defendant Wojcik and others.

d.    In September 1989, Defendant Wojcik and other officers engaged in misconduct when they physically and verbally abused a citizen. This included yelling, "I am going to break your fucking arm" and proceeding to twist his arm behind his back until his elbow fractured. It also included throwing him to the ground and kicking him.

e.    In October 1989, Defendant Wojcik engaged in misconduct when he searched a citizen's apartment without permission or lawful justification and was verbally abusive.

f.    In November 1989, Defendant Wojcik engaged in misconduct when he pointed a gun at a citizen, struck his car with a squad car, threw him and another individual to the ground, kicked him and another individual in the face, and punched him and two others in the face.

g.    In March 1991, Defendant Wojcik engaged in misconduct when he punched a citizen in the face during an arrest and while he was being held in an interrogation room. The citizen required medical attention at a hospital. Defendant Wojcik admitted to investigators that he struck the citizen in the face.

h.    In September 1991, Defendant Wojcik used excessive force on Gilbert Renslow. The city settled the matter for $3,000.

i.    In February 1992, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission while searching for a suspect.

j.    In October 1992, Defendant Wojcik engaged in misconduct when he and another detective entered a woman's apartment without a search warrant or permission.

k.    In December of 1992, Defendant Wojcik beat Roosevelt Myles and attempted to force him to falsely confess to a crime that he did not commit. Defendant Wojcik beat Mr. Myles with a phone book and a flashlight while Mr. Myles was handcuffed to a wall and repeatedly slapped him. Defendant Wojcik likewise coerced witnesses into falsely identifying Mr. Myles. Significantly, Mr. Myles was exonerated in 2022, nearly twenty-seven years after his conviction.

l.    On July 2, 1994, Defendant Wojcik engaged in misconduct when he verbally abused and threatened a citizen during a traffic stop. Wojcik used his police car to push the complainant's car into a tree.

m.  On July 2, 1994, Defendant Wojcik engaged in misconduct when he broke into his ex-girlfriend's home and struck a man inside the home in his head and face with a steel pipe-wrench and damaged various items of property. The man lost two dental caps in the beating. Defendant Wojcik was criminally charged with battery.

n.  In January 1995, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission and pointed a gun at her.

o.  On February 10, 1995, Defendant Wojcik engaged in misconduct when he entered and searched a woman's home without a warrant, choked her, and threw her to the ground. The citizen required medical attention from a hospital for her injuries.

p.  In April 1995, Defendant Wojcik used physical force and threats to coerce a false confession out of Angel Rosado. When Rosado said he did not know anything about the homicide Defendant Wojcik was asking about, Defendant Wojcik repeatedly hit and choked Rosado.

q.  In May of 1995, Defendant Wojcik engaged in misconduct when he helped Defendant Guevara and others frame Thomas Sierra for a murder he did not commit. Mr. Sierra was exonerated in January 2018. Currently, there is a lawsuit pending in the Northern District of Illinois against Defendant Wojcik for his involvement in Mr. Sierra's wrongful conviction.

r.  In June 1995, Defendant Wojcik and other officers engaged in misconduct when they abused a woman by pushing, punching and kicking her in the stomach after they forced their way into her residence.

s.  In January 1996, Defendant Wojcik engaged in misconduct when he and others entered a woman's apartment without a warrant in search of a suspect.

t.  In February 1996, Defendant Wojcik engaged in misconduct when he searched a woman's car, bags and person without permission or a warrant and threatened to physically abuse her, specifically claiming, "I'll knock your fucking block off." Defendant Wojcik explained to OPS that his actions were justified because he had mistaken the woman's make-up case for a chrome-plated handgun.

u.  In December 1997, Defendant Wojcik engaged in misconduct when he searched two apartments without a warrant or permission while looking for a suspect.

v.  In October 1998, a citizen filed a complaint with OPS reporting that Defendant Wojcik had struck an individual on the head with a shotgun during an arrest. The victim was treated at the hospital for a laceration to the head, which he told doctors was caused by being struck with a shotgun.

w.  In October 1998, Defendant Wojcik engaged in misconduct when he entered and searched a residence without a warrant or authorization.

x.  In August 1999, Defendant Wojcik engaged in misconduct when he, along with Defendants Guevara and Halvorsen, physically abused a citizen in their custody. According to the OPS complaint, Defendant Wojcik struck the victim in the face five to ten times. The Detectives refused to allow the victim to speak to an attorney. Following the incident, the victim—a federal prisoner taken from the Metropolitan Correction Center to Area 5—was examined by a Federal Bureau of Prisons physician's assistant and was treated for "bruises to the face, body, right wrist and both arms, and a contusion to the inner elbow and scalp." The victim reported to federal officials that CPD officers physically abused him. Federal officials photographed the victim's injuries.

y.  In 2000, Defendant Wojcik engaged in misconduct when he was assigned to investigate allegations made against Defendant Guevara by a defendant named Juan Hernandez. Mr. Hernandez had filed a complaint reporting that Defendant Guevara had framed him for a murder that he did not commit and had used improper line-up techniques in the process. Defendant Wojcik failed to properly investigate the allegations and instead covered up Defendant Guevara's misconduct.

z.  In April 2000, Defendant Wojcik engaged in misconduct when he entered and searched a residence without a warrant or permission and arrested an individual without probable cause.

aa.  In March 2001, a citizen filed a complaint with OPS reporting that Defendant Wojcik slapped him two or three times on each side of the face, punched him in the stomach, and kicked him when he fell to the floor.  Defendant Wojcik later slapped him three to four times on each side of the face, grabbed him by the throat, threw him down, and slapped him again.  Defendant Wojcik further refused to allow him to speak to an attorney.

bb  In April 2001, Defendant Wojcik engaged in misconduct when he searched a woman's residence without permission or a warrant and verbally abused her.

cc.  In July 2001, Defendant Wojcik engaged in misconduct when he burst into 17-year-old Danny Ramirez's bedroom, grabbed him by the hair and pulled him from his bed. Defendant Wojcik was apparently looking for a suspect because he showed a photograph to Mr. Ramirez and demanded to know if the photo was of Mr. Ramirez or somebody else. Defendant Wojcik and others proceeded to search the apartment. Mr. Ramirez was later taken to Area 5 where other detectives threatened him.

dd.  An attorney filed a complaint with OPS reporting that Defendant Wojcik refused to allow her to speak to her client at Area 5 in July 2001.

ee.    In July 2001, Defendant Wojcik engaged in misconduct when he searched an apartment without permission and stole $1,400.

ff.    In August 2001, Defendant Wojcik used physical force and threats to coerce a false confession from Miguel Skerrett. Despite Skerrett's repeated denials, Defendant Wojcik struck him, pushed his head up against the wall, called him a liar, punched him in the stomach, and kicked him in the back after he fell to the ground. Mr. Skerrett advised Defendant Wojcik that he was HIV-positive, that this made him particularly susceptible to pain, and that he couldn't sustain any more abuse. Defendant Wojcik then told Mr. Skerrett what to say and Mr. Skerrett provided a false confession.

gg.    In August 2001, Defendant Wojcik and other detectives used physical force and threats to attempt to coerce a false confession from Phonakone Sagathit. Defendant Wojcik punched him several times in the chest, punched him in the back of the head and grabbed him by the neck and choked him while slamming his head into a wall until Mr. Sagathit lost consciousness.

ff.    In January 2002, Defendant Wojcik engaged in misconduct when he searched a home without a warrant or permission.

gg.    An attorney filed a complaint with OPS reporting that Defendant Wojcik prevented him from communicating with his client at Area 5 in August 2002. The client told OPS that she had repeatedly requested to talk to her attorney, but was ignored.

hh.    In July 2003, Defendant Wojcik engaged in misconduct when he searched a home without a warrant or permission.

ii.    In March 2004, Defendant Wojcik engaged in misconduct when he and another detective physically abused a man in custody. Defendant Wojcik held him by the arms while another detective held his legs and a third punched him 15 to 20 times in the ribs. After his release from custody, the victim was treated at the hospital for swelling and bruises to his ribs. He told the doctors, "it hurts to breathe."

jj.    In June 2004, Defendant Wojcik engaged in misconduct when he filed false police reports to cover for the wrongful actions of officers who shot Seneca Smith. In 2023, the Illinois 1st District Court of Appeals ordered an evidentiary hearing, finding that Mr. Smith had made a substantial showing of constitutional violations, including that the prosecutor suborned perjury from the arresting officers who shot Mr. Smith.

kk.    In July 2005, Defendant Wojcik engaged in misconduct when he and other officers arrested Janet Yurus, who was placed unbuckled into the back of a police van and transported to the station. During the drive to the station, she was

knocked out of her seat and suffered a laceration to her face. Upon arrival at the station, her requests for medical attention and a lawyer were denied. Defendant Wojcik repeatedly promised Ms. Yurus that she would be released if she told police what they wanted to hear. Defendant Wojcik threatened to lock Ms. Yurus up and charge her with murder for the unrelated death of her son. Defendant Wojcik also threatened to "lock up her daughter and call DCFS to have her grandchildren taken away."

ll.    In December 2007, Defendant Wojcik engaged in misconduct when he held a suspect for three days without charges before he was released. In response to a lawsuit filed against the city, OPS investigated eight officers, including Defendant Wojcik, for their involvement in a wrongful conviction. The so-called "offender" alleged that, in October 1988, he was forced to sign a false confession following threats by Defendant Wojcik and others.

mm.    In January 2009, Defendant Wojcik engaged in misconduct when he refused to initiate a citizen complaint that officers pushed the individual, placed a foot on his back, put him in a chokehold, kicked him, punched him in the face, waved a pocketknife at him and threatened to cut him, pushed him down the stairs, and stomped on him.

nn.    An attorney filed a complaint with OPS reporting that Defendant Wojcik barred him from speaking to his client at the police station in July 2009.

oo.    In July 2014, Defendant Wojcik and others engaged in misconduct when they searched a woman's apartment without a warrant or justification.

pp.    In October 2014, Defendant Wojcik engaged in misconduct when he approved police reports which later-released video revealed to be categorically false in the Laquan McDonald case where McDonald was shot to death by Chicago Police officer Jason Van Dyke. Defendant Wojcik was the "approving supervisor" involved in the subsequent investigation. Defendant Wojcik refused to participate in the investigation or to comply with a subpoena for his testimony. The Inspector General authored a 37-page report that excoriated Defendant Wojcik, recommending his termination (if he was not already retired). Specifically, the Investigator General concluded that Wojcik had made false reports and destroyed reports in connection with the McDonald shooting investigation. The United States Department of Justice specifically cited the false police reports Wojcik had approved as an example of what it called "highly troubling" procedures. Laquan McDonald's family sued Defendant Wojcik, the City and others. The City promptly paid a $5 million settlement.

qq.    Other citizen allegations: on information and belief, the following individuals have been victim to Det. Wojcik's pattern and practice of misconduct: Laron Betts; Mario Cervantes; Daniel Garcia, on whom Det. Wojcik planted evidence; Jamie Garcia; Charles Haslett; Jamie Hauad; Tyrese Hawkins; Ricky Hill, who

was forced to give a false confession after being subjected to physical abuse; Richard Kupferschmidt; John LaVelle, who was denied access to an attorney by Det. Wojcik; Dwight Little, who Det. Wojcik forced to give a false statement; Willie Lloyd; Ryan Murphy; Angel Navarro; Juan Ortiz; Ricardo Pabon; Lenin Perez; Roberto Perez; Keith Pinkley; Marcos Ramirez; Alfredo Ramos; Jesus Rodriguez; Carlos Santos; Terrence Sparks; Peter Zefkiles.

## Defendant Guevara and Halvorsen Long History of Framing Innocent People

98. Prior to becoming a detective in 1990, Defendant Guevara was assigned to Gang Crimes North where he worked as a Gang Crimes Specialist and assisted detectives at Area Five in framing innocent young Latino men for crimes they did not commit.

99. Just by way of example, in 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

100. Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson which he later recanted.

101. Juan Johnson was exonerated and brought a suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

102. As a gang crimes specialist in 1988, Defendant Guevara also caused a 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. Rivera was convicted of the Valentin murder. In 2011, Lopez admitted that he knew Rivera was the "wrong guy." Defendant Guevara also falsely claimed that the victim identified Rivera before he died even though a doctor would later testify that the victim was in a medically induced coma and was not conscious at the time Guevara claimed he made the identification.

103. Rivera was exonerated and brought a federal civil rights lawsuit against Defendant Guevara and others. A federal jury found that Guevara had violated Rivera's civil rights and awarded him $17 million in damages.

104. Once becoming meritoriously promoted to detective, Defendants Guevara and Halvorsen worked as partners to continue their pattern and practice of framing innocent people for crimes they did not commit.

105. As a result of the policies and practices of the Chicago Police Department, described above, Defendants Halvorsen and Guevara framed dozens of innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against the Defendants.

106. As of the filing of this Complaint over 40 men and women have had their convictions thrown out because Defendant Halvorsen and/or Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jose Maysonet, Alfredo Gonzalez, Jorge Pacheco, Roberto Almodovar, William Negron, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, David Lugo, Carlos Andino, Daniel Rodriguez, Jamie Rios, Fabian Santiago, Jamie Rios, Jose Cruz, Marilyn Mulero, Reynaldo Munoz, Johnny Flores, Adolfo Rosario, Eruby Abrego, Nelson Gonzalez, Edwin Davilla, Gamalier Rivera, Madeline Mendoza, Tony Gonzalez, and Johnny Martinez. These men and women served hundreds of years for crimes they did not commit.

107. As of the filing of this Complaint, Defendants Guevara and Halvorsen are being sued for framing Defendants in dozens of federal civil rights actions.

108. Defendants Halvorsen and Guevara have a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and suppressing exculpatory evidence, all in the course of maliciously prosecuting innocent persons.

109. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Halvorsen and Guevara and others, it is apparent that these Defendants engaged in such misconduct because they had every reason to believe that the City of Chicago and its Police Department condoned their behavior.

110. For over a decade, Defendant Guevara has repeatedly invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. Before Defendant Halvorsen died, he also invoked his Fifth Amendment right not to answer questions about allegations against him, including questions posed to him about his conduct in *this* case.

111. The following chart reflects a summary of just some of the allegations lodged against Defendants Guevara and Halvorsen:

| WITNESS | SUBSTANCE OF SWORN TESTIMONY/AFFIDAVIT |
|---|---|
| Armando Serrano | Armando Serrano spent twenty-three years incarcerated for the murder of Rodrigo Vargas, a crime he did not commit. Officers Halvorsen, Guevara and Mingey conspired with prosecutors to frame Serrano for Vargas' murder. Halvorsen and Guevara fabricated witness testimony from a notorious "snitch" witness, Francisco Vicente to secure the conviction of Serrano. Halvorsen and Guevara knew Vicente from the streets and cultivated him as a snitch witness to help frame Serrano. The officers also beat and coerced Timothy Rankins into testifying before the Grand Jury against Serrano. Serrano himself was interrogated by detectives Halvorsen and Guevara who used a good cop/bad cop approach in attempting to coerce a statement from him through physical and psychological abuse. On June 7, 2016, the Appellate Court opined |

| | |
|---|---|
| | "in many of the cases where an individual has accused Guevara of misconduct, Halvorsen is accused of participating or at least being involved in the case. He is not some disinterested witness, especially after the myriad allegations of misconduct have been brought to light." Halvorsen invoked his fifth amendment right, refusing to answer any questions regarding his investigation into the Vargas murder and the prosecution of Serrano. Specifically, when asked whether he framed Armando Serrano and his co-defendant Jose Montanez, Halvorsen pled the Fifth. Serrano was later exonerated and received a certificate of innocence. A federal civil rights action against Guevara and Halvorsen (and others) was settled for over $15 million. |
| Jose Montanez | Jose Montanez also received a certificate of innocence after being exonerated in 2016 for the murder of Rodrigo Vargas on February 5, 1993. In 2016, the appellate court found that "Montanez and his codefendant Serrano presented profoundly alarming acts of misconduct in the underlying investigation and prosecution that warrant closer scrutiny by appropriate authorities." The same evidence used to convict Serrano (as mentioned above) was used to implicate Montanez. Halvorsen invoked his fifth amendment right, refusing to answer any questions about his role in the investigation and prosecution of Montanez and Serrano. Montanez's civil rights action was also settled for over $15 million. |
| Roberto Almodovar | Roberto Almodovar received a certificate of innocence after spending twenty-three years in prison for the murders of Amy Merkes, Jorge Rodriguez and the attempted murders of Kennelly Saez and Jacqueline Grande. Halvorsen, Guevara and other officers conspired to frame Almodovar for these murders even though they knew he was innocent. Halvorsen and Guevara manipulated Grande into falsely identifying Almodovar by informing her, while she was still in the hospital suffering from a gunshot wound, that Almodovar was the person who shot her and murdered her friends and she should identify them in a line-up. Halvorsen falsified police reports alleging that Almodovar admitted that he was a gang member and induced a second witness, Kennelly Saez to identify Almodovar in a line-up. During his deposition, Halvorsen pled the fifth when asked if he framed Roberto Almodovar for the murders of Merkes, Rodriguez and the attempt murders of Saez and Grande. Almodovar was exonerated and received a certificate of innocence. He currently has a pending federal civil rights lawsuits against Halvorsen and Guevara. |
| William Negron | William Negron, the co-defendant of Roberto Almodovar was falsely implicated in the murders of Amy Merkes, Jorge Rodriguez and the attempted murders of Kennelly Saez and Jacqueline Grande as well. Halvorsen, Guevara and Mingey used the same evidence against Almodovar to implicate Negron – two false identifications. Halvorsen asserted his fifth amendment right when asked if he framed William |

| | |
|---|---|
| | Negron for the murders of Merkes, Rodriguez and the attempt murders of Saez and Grande. |
| Angel Rodriguez | In 2000, the murder conviction of Angel Rodriguez was reversed by the appellate court, which found that the testimony of the State's purported eyewitness, which was procured by Halvorsen, was not credible and directed that Rodriguez be released without retrial. In this case, Halvorsen threatened to charge the only witness, Andrew Bolton with conspiracy to commit murder if he didn't identify Rodriguez to close the case. Halvorsen also used improper and suggestive identification procedures by including Rodriguez in multiple photo arrays that he persistently and consistently showed Bolton to influence his identification. |
| Jose Maysonet Jr. | Jose Maysonet was framed for the murder of the Wiley brothers in and around August 22, 1990 by Halvorsen, Guevara, Mingey, Montilla Paulnitsky and ASA DiFranco. Specifically, Halvorsen authored a false and fabricated supplemental police report that served to justify Maysonet's unlawful arrest and bolster the bogus investigation conducted by his fellow officers. Halvorsen also gave false testimony before the grand jury. Halvorsen was asked during his deposition if he framed Jose Maysonet for the murders of Kevin and Torrence Wiley and if he fabricated statements to use against them. He asserted his fifth amendment right to both questions. Maysonet's convictions were vacated in November 2017. |
| Arthur DeLeon-Reyes | DeLeon-Reyes ("Reyes") was exonerated for the 1998 double murder of Mariano and Jacinto Soto and the abduction of their infant daughter. Reyes proclaims that Guevara, Halvorsen and other CPD officers slapped him repeatedly and tricked him into signing a confession in English even though Reyes spoke no English and thought he was signing release papers. Reyes was repeatedly struck and beaten while handcuffed by the officers and interrogated over a period of 40 hours. DeLeon-Reyes' convictions were vacated after an evidentiary hearing where the trial court judge concluded that detective Guevara was a liar. De-Leon Reyes received a COI. |
| Gabriel Solache | Solache, the co-defendant of Reyes, was also exonerated as a result of Halvorsen, Guevara and other CPD officers' misconduct. The officers coerced and fabricated false inculpatory evidence and hid exculpatory evidence from Solache resulting in almost twenty years of wrongful incarceration and over two years on death row.  Solache had been at the police station for more than forty hours, deprived of sleep food and access to the bathroom and was forced to sign a statement in English even though he did not speak, read or write in English. Guevara's beating of Solache was so severe that it caused permanent hearing loss. Solache received a COI. |
| Thomas Sierra | Thomas Sierra was exonerated for the murder of Noel Andujar after spending twenty-two years in prison. CPD Detectives Halvorsen, Guevara and others manufactured false evidence against Sierra |

| | |
|---|---|
| | including two fabricated eyewitness identifications. When questioned about the Sierra matter at his fifth deposition, Halvorsen pled the fifth when asked if he framed Thomas Sierra for the murder of Noel Andujar. He also pled the fifth when asked if he told eyewitnesses Albert Rodriguez and Jose Melendez who to pick out of the photo line-up and array. In addition, Halvorsen pled the fifth when asked if he had falsified police reports in the Sierra matter and committed perjury at Sierra's trial. |
| Eruby Abrego | Abrego contends that he is serving a 90-year prison sentence for a murder that he did not commit as a result of the misconduct of Officers Guevara, Halvorsen and Wojcik. Abrego alleges that Guevara and Halvorsen coerced one of the witnesses, Ramon Torres to identify Abrego as the shooter. Torres has since recanted his testimony and explained that the police told him Abrego was the shooter and he went along with what the police wanted him to say even though he knew Abrego was not the shooter. The police forced Torres to implicate Abrego in a line-up and testify against him. |
| Tony Gonzalez | Tony Gonzalez proclaims that he is wrongly incarcerated for first degree murder of Hector Rivera and attempt murders of Luis Marrero and Iluminada Nieves as a result of Halvorsen and Guevara's misconduct. Halvorsen and Guevara improperly influenced Marrero and 15-year-old Spanish speaking witness, Yesenia Rodriguez to identify Gonzalez in-court. (Ex. 20) Halvorsen asserted his fifth amendment right when asked if he and Guevara used Yesenia Rodriguez to frame Tony Gonzalez for the murder of Rivera and attempts of Marrero and Nieves. |
| Francisco Vicente | Vicente was physically and psychologically coerced and threatened by Halvorsen and Guevara for the purpose of cultivating him as a "witness" in cold case murder investigations. Specifically, Vicente was used as a "jailhouse snitch" to implicate Armando Serrano, Jose Montanez, Jorge Pacheco, Geraldo Iglesias and Robert Bouto. In order to obtain Vicente's cooperation, Halvorsen played "good cop" to Guevara's "bad cop" and offered Vicente perks while incarcerated such as food and candy, knowing that Vicente was going through heroin withdrawals, lighter sentences for his voluminous criminal charges, private prison visits with his wife and money. Both Halvorsen and Guevara also beat Vicente when he didn't do as they said. During his deposition, Halvorsen was asked if he actually used physical and psychological coercion against Vicente to implicate Montanez, Serrano and Pacheco and he pled the fifth. Halvorsen also pled the fifth when asked if used Vicente to make up a false story to implicate Iglesias. |
| Robert Bouto | Bouto was wrongly convicted for the murder of Salvador Ruvalcaba. Halvorsen, Guevara and Mingey worked jointly to frame Bouto by fabricating police reports, withholding exculpatory and material evidence, coercing witnesses to implicate him, and conducting unlawfully suggestive line-ups. Specifically, Halvorsen and Guevara told Vicente they'd help him with his robbery charges if he assisted in framing Bouto for Ruvalcaba's murder. During his deposition, |

| | |
|---|---|
| | Halvorsen pled the fifth when asked about these specific allegations. Bouto received a certificate of innocence. |
| Carl Richmond, Frankie Escobar, and Rey Lozada | Guevara and Halvorsen directed Richmond, Escobar and Lozada to falsely identify Robert Bouto as the shooter of Salvador Ruvalcaba from a line-up. Prior to identifying Bouto in a line-up, Guevara and Halvorsen had the witnesses view Bouto in handcuffs. They threatened to frame Richmond for a murder if he did not make an identification.<br><br>At his deposition, Halvorsen pled the fifth when he was asked if he improperly influenced the witnesses in the Ruvalcaba murder to choose Bouto out of the line-up. He pled the fifth when asked if he harassed Carl Richmond in an effort to get him to falsely implicate Bouto at trial. Halvorsen again pled the fifth when asked if he told Richmond he would place false charges on him if he did not implicate Bouto. |
| Antonio McDowell | McDowell alleges that he was framed by Guevara and Halvorsen using coercive tactics and improperly influencing witnesses to falsely identify him. |
| Alfredo Gonzalez | On August 22, 1990, Gonzalez was arrested for a double murder by Detectives Halvorsen and Guevara. He was taken to Area 5 and placed in an interrogation room. During his interrogation, Gonzalez was beaten, threatened and held incommunicado even after asking for his lawyer. Halvorsen told Gonzalez, "I know him [Guevara], He is never going to let you leave here until you admit you did this." Halvorsen also stomped on Gonzalez's foot breaking his big toe, and slapped him several times. Halvorsen further conspired with ASA DiFranco in order to secure fabricated statements from Gonzalez and Maysonet that would later be used against them to secure their wrongful conviction Halvorsen was asked during his deposition, "Isn't it true that you framed Alfredo Gonzalez for the murders of Kevin and Torrence Wiley that occurred on May 24, 1990?" Halvorsen pled the fifth. Gonzalez's convictions were vacated and all charges dismissed against him. |
| Justino Cruz and Christopher Goosens | Halvorsen conspired with Guevara, Paulnitsky, Mingey and Epplen to frame Cruz and Goosens for the murders of Kevin and Torrence Wiley on May 24, 1990. |
| George Laureano | George Laureano testified that around 1988-1989 Detectives Halvorsen and Gang Crimes Specialist Guevara attempted to frame him for a murder even though he was in custody at the time. He was never charged for that murder.<br><br>In late 1991, Halvorsen and Guevara tried again, and attempted to frame him and his co-defendant Daniel Rodriguez for the murder of Junito (Jose Hernandez). Laureano hired Richard Beuke as his attorney who promised to get him acquitted once he got his case transferred to Judge Reyna. Laureano was acquitted. Rodriguez was convicted and sentenced to 25 years. Rodriguez was later exonerated and received a COI. |

| | |
|---|---|
| | In winter of 1993, Laureano was at the Homicide Division at Area 5 with Halvorsen, Guevara, and Joe Miedzianowski[1] because he was the only witness to a murder on Keystone and Cortland. While at the police station, the officers said, "Bro, we need a favor. We don't like this asshole, and we just need you to say it was him. He is a jag off, we don't like him, and we want to put this case on him." They were referring to a guy named Chino. Laureano refused to frame an innocent man and showed the officers an obituary for the guy who actually committed the murder. Halvorsen replied, "You are going to put it on a dead man, right?" Laureano said yes, he is the one who did it," and the officers said okay and closed the case.<br><br>Laureano was approached again in the late 90s about a murder of Daniel Matias ("Snoopy") that occurred on Keystone and Bloomingdale by Halvorsen and Guevara. The officers asked Laureano if he knew a girl named Jessica Rivera because she was a witness to that murder. They wanted Laureano to help them pin a murder on a Spanish Cobra named Diego by convincing Rivera to go along with the untruthful story that Rivera and Laureano were walking down the street together and observed Diego shoot the victim. Laureano recalls Rivera being scared and ultimately fled to Puerto Rico before they could charge Diego with the murder. Years later, Laureano found out that the officers pinned the murder on Ramiro Alvarez ("Tiger") and Manuel Suastegui ("Gatto")<br><br>During Halvorsen's deposition, he was asked if he and Detective Guevara conspired to frame George Laureano for a murder even though Laureano had an alibi and was in custody at the time. Halvorsen pled the Fifth. Halvorsen also pled the Fifth when asked about framing Laureano for Junitos murder. He further pled the fifth when asked if Guevara told him that Laureano paid $20,000 to beat the case again Junito in front of Judge Reyna. |
| Efrain Cruz and Francisco Veras | Detectives Halvorsen, Guevara, Mingey and Sergeant Epplen conspired to frame two individuals for the murders of the Wiley brothers which occurred on May 25, 1990. Both witnesses were released after the officers realized they were in police custody on the day of the shooting. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Geraldo Iglesias | Iglesias was framed for the shooting death of Monica Roman on June 7, 1993 by Halvorsen and other police officers. Halvorsen fabricated evidence, falsified police reports, withheld exculpatory evidence and coerced witnesses as part of the homicide investigation. Halvorsen pled |

---

[1] Miedzianowski has been called "the most corrupt cop in the city's history." He is currently serving a life sentence in federal prison. Todd Lighty & Matt O'Connor, *Rogue cop gets life*, Chi. Trib., January 25, 2003 (available online at http://articles.chicagotribune.com/2003-01-25/ news/0301250139_1_joseph-miedzianowski-gang-members-badge) .

| | |
|---|---|
| | the fifth during his deposition when asked about these specific allegations. |
| Rosendo Ochoa | Ochoa was used by Halvorsen to frame Geraldo Iglesias for the shooting death of Monica Roman. Ochoa told Halvorsen he could not make an identification of the shooter in either a photo array on June 22, 1993 or live lineup on June 23, 1993. Halvorsen told Ochoa to pick out Iglesias even though Ochoa initially selected someone other than Iglesias from the line-up. Halvorsen improperly influenced Ochoa's decision to pick Iglesias out of both the line-up and photo array. Additionally, Halvorsen used threats and incentives related to Ochoa's own legal problems to coerce him into falsely identifying and testifying against Iglesias in June 1993. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Hugo Rodriguez | Rodriguez was an eyewitness to the shooting of Monica Roman. Halvorsen coerced Rodriguez into falsely identifying Geraldo Iglesias from a photo array and from a live line up on June 24, 1993. Even though Rodriguez could not make an identification of the shooter, Halvorsen threatened and coerced Rodriguez into identifying and testifying against Iglesias. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Michael Ybarra and Ivara Valasco | Halvorsen showed Edwin Davilla's photograph to Ybarra and Valasco to get them to identify Davilla for the murder of Jaime Alvarez. Halvorsen helped construct the lineup that Ybarra and Valsco viewed in July 1995 in an effort to frame Mr. Davilla for the Alvarez murder. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Edwin Davilla | Edwin Davilla was framed for the murder of Jaime Alvarez in June 1995. Guevara and Halvorsen had no probable cause to arrest Davilla. The detectives lied in their police report when they claimed two witnesses selected him from a photo array. The officers also forced Davilla to turn around during his lineup in order to expose his gang tattoo in an effort to influence the line-up. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| David Colon | Halvorsen pled the fifth when asked if he and Detective Guevara conspired to falsely charge David Colon with murder. He further testified that he falsified police reports and withheld documents from the State's Attorney and Mr. Colon's attorneys in an effort to frame David Colon for murder. |
| Efrain and Julio Sanchez | Both men gave sworn affidavits, swearing that they falsely identified David Colon as the shooter of Michael Velez as a result of threats and intimidation by Detectives Ernest Halvorsen and Reynaldo Guevara who were the lead detectives in the Velez investigation and the detectives who conducted the line-up in the Velez investigation. |

| | |
|---|---|
| | During Halvorsen's deposition, he pled the fifth when asked if he improperly influenced Efrain and Julio Sanchez to pick David Colon out of a line-up on September 8, 1992. |
| Manuel Rivera | Manuel Rivera was framed by Officer Halvorsen and other Chicago police officers for the murder of Marlon Wade in October 1989. During his deposition, Halvorsen pled the fifth when he was asked if he had any legitimate reason to suspect Rivera in the Wade murder. Halvorsen knew the IDs against Rivera were fabricated and had no reason to believe Rivera was the actual murderer. |
| Lorette Helean, Tran Brown and Virgilio Muniz | Officers Halvorsen, Guevara, Villardita and Gawrys improperly influenced Helean, Brown and Muniz to identify Manuel Rivera for the murder of Marlon Wade in October 1989 even though they knew Rivera was not the shooter. All three witnesses could not identify the shooter and Halvorsen knew their IDs were fabricated. While in Halvorsen's presence, Guevara told Muniz if he did not implicate Rivera in the Wade murder, Guevara would charge Muniz with the Wade murder. Halvorsen pled the fifth during his deposition when asked about these specific allegations. |
| Juan and Rosendo Hernandez | Juan and Rosendo Hernandez were framed for the murder of Jorge Gonzalez in June 1997 by Halvorsen and Guevara. The officers intentionally placed Rosendo and Juan in unduly suggestive lineups by having them be the only one in the lineup with booking numbers in their hands. |
| Jacqueline Montanez | On May 13, 1992, Halvorsen and Guevara coerced a false confession from Montanez, a 15-year-old juvenile, for the murders of Jimmy Cruz and Hector Reyes. In June 1995, the Appellate Court reversed and remanded for a new trial finding that "defendant was interrogated throughout the night as part of a pattern of police conduct designed to elicit a confession and that, during that interrogation, the police had prevented the efforts of defendant's mother to see the defendant until the confession was taken." Halvorsen pled the fifth when asked if he conspired to frame Montanez and coerced her to provide a false confession. |
| Daniel Rodriguez | Rodriguez averred that in March 1991, he falsely confessed to a murder under coercion from Officer Halvorsen and his partner Guevara. During his arrest, Halvorsen pushed him to the ground while pointing a gun at him stating, "you win!" "You got Junito's murder!" During Rodriguez's interrogation, Halvorsen struck him repeatedly and convinced him that if he just admitted he was the driver in the shooting, he would be able to go home. Halvorsen also prepared a typed written statement for Rodriguez in told him "this is what you are going to say." <br><br> During Halvorsen's deposition, he pled the fifth when asked if he and Detective Guevara conspired together to frame Daniel Rodriguez for the murder of Jose Hernandez ("Junito"). |

| | |
|---|---|
| Jed Stone re: Voytek Dembski | Dembski, a polish National who did not read or speak English, was interrogated by Halvorsen and Guevara without *Miranda* warnings, without notification to the Polish consulate, and without an interpreter. Dembski could not read the statement he eventually signed. Halvorsen and Guevara deliberately used Dembskis inability to speak English to obtain a false confession to the murder of Josef Skowron. |
| Luis Figueroa | Figueroa testified that in 1995, he viewed a line-up in connection with a murder investigation and falsely identified Angel Diaz as the shooter after being directed to do so by Detectives Halvorsen and Guevara. Figueroa recanted his identification at trial. |
| Angel Diaz | Angel Diaz was framed by Officers Halvorsen and Guevara for the murder of Yolanda Leal. The officers improperly influenced the witness Luis Figueroa into identifying Diaz as the offender. |
| David Velasquez | In May 1991, after sixteen-year-old David Velasquez told Detectives Halvorsen and Guevara he knew nothing about the murder of "Junito," The Detectives took Velasquez to a rival gang's territory and falsely alerted local gang members that Velasquez was responsible for the murder of Junito (a member of the local gang). After Velasquez begged Halvorsen and Guevara to put him back in the police car, they drove Velasquez to the station, where they chained him to a wall, beat him, and threatened him if he did not falsely implicate Daniel Rodriguez as "Junito's" shooter, Guevara would "pin" Velasquez with it. As a result of Det. Guevara's conduct, Velasquez implicated Rodriguez in a false statement |
| Timothy Rankins | Timothy Rankins provided a sworn testimony wherein he described the abuse he endured by Detectives Halvorsen, Guevara and Mingey when he was 19 years old. He said they put a phone book over his head and beat it with a flashlight, threw him out of his chair, and placed him in a chokehold to induce him to sign a pre-prepared statement implicating Serrano and Montanez. As a result, Rankins testified falsely before the Grand Jury but ultimately refused to testify at trial. Halvorsen pled the fifth when asked if he, Guevara and Mingey would either coerce or entice Mr. Rankins, whatever it took, to falsely implicate Montanez, Serrano and Pacheco in the Vargas murder. Halvorsen also took the fifth when asked if he told Rankins he could get his robbery dismissed if he implicated Serrano, Montanez and Pacheco. Halvorsen watched as Guevara beat Rankins over a twenty-four hour period and did nothing to stop him. |
| Jose Garcia | Jose Garcia filed a post-conviction petition alleging that he is actually innocent of the murder of Ajeandro Ocampo that occurred on July 13, 1995. He contends that during his interrogation, he did not knowingly or intelligently waive his *Miranda* rights and that any statements he made were a result of deception and material misrepresentations made by Officers Halvorsen and Guevara. Garcia asserts that Halvorsen hit him in his head and face and told him if he said something wrong, he'd be taken by to the interrogation room. At his trial, it was stipulated that |

| | |
|---|---|
| | Halvorsen lied to Garcia during his interrogation by telling Garcia that his alibi witness Alvarez had been interviewed and did not corroborate Garcia's alibi. He further argued that the officers abused and threatened key occurrence witnesses to inculpate Garcia. |
| Adriana Mejia and Rosauro Mejia | In 1998, while investigating the case in which Gabriel Solache and Arturo Reyes were framed, Halvorsen played good cop while Guevara brutally beat Rosauro Mejia and Adriana Mejia in order to obtain false confessions. Guevara repeatedly hit Rosauro Mejia in the presence of Halvorsen who did nothing to stop Guevara's unlawful conduct. Similarly, Guevara while in the presence of Halvorsen, pulled Adriana Mejia's hair and struck her on the back of the neck while interrogating her. Adriana also testified that Det. Guevara threatened her with life in prison. Rosauro never confessed and was finally released after being held in custody for three days. Both Gabriel Solache and Arturo DeLeon-Reyes have been exonerated. |
| Santos Flores | In 1995, Halvorsen and his partner Guevara coerced a confession from seventeen-year old Santos Flores after handcuffing him to a wall of a locked interview room and refusing his requests for an attorney. Flores eventually gave a statement indicating his involvement in the crime. The conviction was reversed on appeal because the "circuit court erred in denying defendant's motion to suppress the statement." In his deposition, Halvorsen pled the fifth when asked if he and Detective Guevara conspired to frame Santos Flores for a crime he did not commit. |
| Juan Hernandez | In August 1999, a citizen filed a complaint with OPS reporting that Det. Halvorsen "grabbed [the victim's head] and twisted it" and, according to an OPS investigator, "failed to provide for the safety and security of Juan Hernandez who was injured in his custody, and failed to seek medical treatment for him[.]"During this same incident, Det. Guevara had grabbed his face and arms, placed him into a headlock, and elbowed him while attempting to force him into a lineup. An OPS investigator himself further reported that Det. Guevara had "failed to provide for the safety and security of Mr. Hernandez who was injured in his custody, and failed to seek medical treatment for him[.]" Also during this incident, Det. Wojcik struck the victim in the face five to ten times. The detectives refused to allow the victim to speak to an attorney. Following the incident, the victim—a federal prisoner taken from the Metropolitan Correctional Center to Area 5—was examined by a Federal Bureau of Prisons physician's assistant and was treated for "bruises to the face, body, right wrist and both arms, and a contusion to the inner elbow and scalp." The victim reported to federal officials that "CPD officers physically abused him" and "roughed me … up." Federal officials photographed the victim's injuries. The victim was taken to the hospital for treatment where he reported being "hit by police officers." |

| State Representative William Delgado | In April 2001, State Representative William Delago filed a complaint with OPS contending that Officers Halvorsen and Guevara falsely testified at 17 homicide trials. Delgado told OPS that upon interviewing the defendants in those cases, they all stated that the detectives had told them "we're tired of busting you on petty crimes and we're gonna get you. We'll bust you for murder." |
| --- | --- |
| William Dorsch | Retired Area 5 Chicago Police Detective William Dorsch has testified under oath in numerous occasions about an incident in 1990 where he observed Guevara point to a photo signaling to a witness who to identify from the photo array. Additionally, at Plaintiff's post-conviction hearing, Dorsch testified that Halvorsen falsely claimed in the unrelated murder investigation of William Stewart that Dorsch had provided him with a tip that led to the arrest of Fabian Santiago. Dorsch testified that he was never involved in the investigation and provided no such tip to Halvorsen. The "tip" was fabricated. Santiago was later exonerated in 2022. |

112. Neither Defendants Halvorsen nor Guevara ever received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

113. In fact, the City of Chicago failed to supervise or discipline its police officers including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**Plaintiff's Damages**

114. Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct. Plaintiff served over 23 years in prison for crimes that he did not commit. He woke up each day with this reality, not knowing whether he would see his family again outside prison property or ever successfully prove the wrongfulness of his conviction and incarceration.

115.     As a result of Defendants' actions, Plaintiff continues to experience physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

## COUNT I
### 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

116.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

117.     As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fourteenth Amendment.

118.     In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Parra implicating Plaintiff in the crimes that they knew he did not commit; fabricated a false statement from Plaintiff; fabricated false identification evidence; falsified police reports; obtained Plaintiff's conviction using false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

119.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

120.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murder of Jose Garcia. Thus, the defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

121.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

122.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

123.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT II
### 42 U.S.C. § 1983 – *Brady* Violations

124.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

125.     As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

126.     All of the Defendant Officers concealed exculpatory evidence that: (1) Defendants fabricated and coerced a false statement from Plaintiff, and his criminal co-defendants Juan Parra and Eruby Abrego; (2) false identification evidence against Abrego; and (3) statements from the witnesses declaring that Abrego was not the shooter. The Defendant

Officers knew who the true culprits were and concealed the information from the criminal justice system.

127.     The Defendant officers hid police reports memorializing this exculpatory evidence in different files and purposefully ensured that the reports were not including in the investigative file or forwarded to prosecutors so that Plaintiff and his defense counsel would not discover the exculpatory evidence.

128.     The Defendants further suppressed their own misconduct and the misconduct of their fellow officers.

129.     The Police Officer Defendants continued to suppress exculpatory evidence after Plaintiff's conviction. Had this exculpatory evidence been disclosed, Plaintiff would not have spent 23 years in prison for a crime he did not commit.

130.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

131.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

132.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.


**COUNT III**
**42 U.S.C. § 1983 - Coerced and False Confession**

133. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

134. In a manner described more fully above, the Police Officer Defendants and Defendant Nazarian, acting in an investigatory capacity and without probable cause to suspect Plaintiff of the crime, individually, jointly, and in conspiracy with one another, and other unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make a false statements involuntarily against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his constitutional rights under the Fifth and Fourteenth Amendments.

135. In addition, the Police Officer Defendants and Defendant Nazarian, acting as an investigator and without probable cause to suspect Plaintiff of any crime, individually and jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

136. Specifically, Police Officer Defendants and Defendant Nazarian conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion and false promises of release which overbore Plaintiff's will and resulted in him making involuntary statements implicating himself in the shooting.

137.     Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff who was forced to regurgitate the statements before a court reporter.

138.     Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of Garcia's murder.

139.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

140.     As a result of Defendants' misconduct described in this County, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

141.     The misconduct described in this County by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT IV
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention

142.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

143.     In manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

144.     The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

145.     In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

146.     The Defendant officers subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendants' fabrication of evidence, and suppression, and withholding of evidence.

147.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's clear innocence.

148.     As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

149.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

150.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

151.     All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to coerce, induce, and

fabricate false evidence in the form of witness statements and testimony for the purpose of framing Plaintiff for a crime he did not commit.

152. All of the individual Police Officer Defendants, and other co-conspirators, known and not yet known to Plaintiff, reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

153. In this manner, the Police Officer Defendants acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

154. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant joint activity.

155. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

156. As a direct and proximate result of this of this illicit agreement referenced above, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

157. The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene**

158.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

159.     In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

160.     These Defendants had ample, reasonable opportunities as well as a duty to prevent this harm but failed to do so.

161.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

162.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

163.     The misconduct described above in this Count by the Defendant officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT VII**
**42 U.S.C. § 1983 – *Monell* Policy and Practice Claim**

164.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

165.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1985, no fewer than 75 documented cases have come to light in which Chicago

Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

166. The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) coercion of false and fabricated inculpatory statements; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; and (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

167. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

168. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including but not limited to the named Defendants, concealed exculpatory evidence from Plaintiff, including evidence that Defendants coerced, manipulated, and procured false statements and false identification testimony.

169. At all times relevant hereto, members of the Chicago Police Department, including but not limited to the Defendants in this action, routinely manipulated, tricked, lied to,

and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

170.    The City of Chicago and the Chicago Police Department has failed to investigate any of the cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

171.    Prior to and during 1993, the year in which Plaintiff was falsely charged with the murder of Jose Mendoza, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The Former Chicago Police Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

172.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

173.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to

believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens

174.     The defendant officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulation/coercion of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are over 50 known cases in which Guevara and Halvorsen engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

175.     The City of Chicago and its Police Department failed in 1985 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

b.     The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.     The need to refrain from using physical violence, threats of violence, and psychological coercion to procure involuntary statements from suspects.

> d. The risks of wrongful conviction and the steps police officers should take to minimize risks.
>
> e. The risks of engaging in tunnel vision during investigation.
>
> f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

176. The need for police officers to be trained in these areas was and remains obvious. The City of Chicago's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

177. The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

178. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

179. The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

180.     The actions of all of the individual Police Officer Defendants were done pursuant to policies and practices of the Chicago Police Department were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the Defendant City of Chicago which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, among others:

a.    manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony.

b.    filing false reports and giving false statements and testimony about interrogations and witness interviews or constructing parts or all of witness statements; suppressing evidence concerning interrogations and/or witness interviews; pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of fabricated witness statements, including those by "jailhouse snitches;" and otherwise covering up the true nature of those interviews and/or interrogations.

c.    failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers, particularly those who are repeatedly accused of misconduct, on how to avoid false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions, and on the proper manner in which to conduct interrogations of witnesses and arrestees. Among those the City failed to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control were the repeat offenders Defendants Guevara and Halvorsen.

d.  perpetuating, encouraging and condoning the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a-d above, whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to report. This code of silence caused police officers either to remain silent or give false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves or fellow officers from discipline, civil liability, or criminal charges. The code of silence also caused police officers to perjure themselves in criminal cases where they and their fellow officers have fabricated evidence or concealed exculpatory evidence.

181.  The policies and practices described in this Count and in the factual allegations section of this Complaint were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

182.  As a direct and proximate result of the City's actions, Plaintiff suffered injuries, including, but not limited to, emotion distress, as if more fully alleged above.

183.  The City of Chicago is therefore liable for the misconduct committed by the Police Officer Defendants.

**COUNT VIII**
**State Law Claim – Malicious Prosecution**

184.  Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

185.	All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

186.	The Defendants accused Plaintiff of murdering Jose Garcia, knowing that he was innocent of the crime. All of the individual defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

187.	The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

188.	As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

189.	Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

190.	As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means. In additional, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

191.	In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

192. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotion distress, were accomplished by Defendants' conspiracy.

193. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

194. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

195. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

196. The acts and conduct of the individual Defendants as set forth above were extreme and outrageous. The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause sever, emotional distress to Plaintiff.

197. The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

198. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

199. As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XI
## State Law Claim - Willful and Wanton Conduct

200.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

201.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct.

202.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

203.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XII
## State Law Claim – *Respondeat Superior*

204.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

205.    When they committed the acts alleged in this Complaint, the individual Defendant officers were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

206.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XIII
## State Law Claim – Indemnification

207.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

208. Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on upon the employees' misconduct committed within the scope of their employment activities.

209. The individual Defendant officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff Jeremiah Cain prays this Court enter judgment in his favor and against Defendants Anthony WOJCIK, Reynaldo GUEVARA, GERI LYNN YANOW as Special Representative of Ernest HALVORSEN, deceased, Daniel ENGEL, Jerome BOGUCKI, Ray SCHALK, Nancy NAZARIAN, the CITY OF CHICAGO and COOK COUNTY awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Respectfully Submitted,
**JEREMIAH CAIN**

By:    /s/JENNIFER BONJEAN
*One of His Attorneys*

BONJEAN LAW GROUP, PLLC
Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY 10022
718-875-1850

**Chicago Address**
53 W. Jackson Blvd., Ste. 315
Chicago, Illinois 60604